IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville June 23, 2015

## STATE OF TENNESSEE v. DOYALE MONTEZ BLACKSMITH

**Appeal from the Criminal Court for Davidson County**
**No. 2012-A-159    Monte D. Watkins, Judge**

---

**No. M2014-01417-CCA-R3-CD – Filed July 29, 2015**

---

The Defendant, Doyale Montez Blacksmith, was convicted by a Davidson County Criminal Court jury of aggravated rape, a Class A felony, aggravated kidnapping, a Class A felony, and aggravated stalking, a Class E felony. *See* T.C.A. §§ 39-13-502 (2014), 39-13-304 (2014), 39-17-315 (2010) (amended 2012). The trial court sentenced the Defendant as a Range II, multiple offender to concurrent terms of thirty years for aggravated rape and fifteen years for aggravated kidnapping each at 100% service. The trial court sentenced the Defendant as a Range III, persistent offender to five years for aggravated stalking and ordered the sentence be served consecutively to the aggravated rape and aggravated kidnapping sentences, for an effective thirty-five-year sentence. On appeal, the Defendant contends that the evidence is insufficient to support his aggravated rape conviction. We affirm the Defendant's aggravated rape conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Nicholas McGregor (on appeal) and Shaw Cunningham (at trial), Nashville, Tennessee, for the appellant, Doyale Montez Blacksmith.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Hugh Ammerman and Toli Rosenblum, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

At the trial, the victim, V.N.,[1] testified that she had known the Defendant for several years and that by August 6, 2011, she and the Defendant had been involved in a periodic romantic relationship for about five years. She said that while she and the Defendant were dating, the Defendant also dated Bernice Williams, who was also known as Gina. V.N. and Ms. Williams were friends, and they each knew of the other's relationship with the Defendant. V.N. did not have an issue with the arrangement. The general tenor of the relationship was that the Defendant came to V.N.'s house after Ms. Williams went to work, that he spent time with V.N. during the day until Ms. Williams finished working, and that he usually stayed overnight at Ms. Williams's home. V.N. said the Defendant did not have a home of his own and only worked periodically. On occasions when the Defendant stayed overnight with V.N., the Defendant told Ms. Williams that he was staying with his brother. V.N. lived alone, and the Defendant was the only additional person who possessed a key.

V.N. testified that on August 6, 2011, at 3:00 a.m., she was home sleeping when the Defendant entered her home by using his key, woke her, and asked why she had called Ms. Williams. V.N. denied calling Ms. Williams, and V.N. and the Defendant argued. V.N. said that the Defendant became enraged and that she thought he was under the influence of something. She said the Defendant removed his belt and told her, "I'll tell you what . . . take your clothes off . . . strip your clothes." She complied. The Defendant said, "Stretch your hand out on the bed." As V.N. turned around, she said the Defendant struck her on her back with the belt. She said she jumped, and the Defendant ordered her to "turn around" and to place her hands on the bed again. She complied, and the Defendant struck her with the belt repeatedly. She yelled from the pain, and the Defendant left the bedroom and turned on the radio in the living room. She thought the Defendant did not want her neighbors to hear her screams. She said that when the Defendant returned to the bedroom, he said, "I'll tell you what . . . take your panties off. Have you had enough? Turn your legs out." V.N. said she sat on the bed and opened her legs. She said he wrapped the belt around his hand and struck her in the face. She said the Defendant then inserted his finger in her vagina to determine if she had engaged in sexual relations with any other men. After the Defendant's examination, he struck V.N. in the face with the belt buckle.

V.N. testified that the Defendant left the home long enough for her to put on her clothes, that he returned, and that he said, "Come go with me." She said that she told the Defendant she was not going anywhere with him and that the Defendant struck her with the belt. She then went with the Defendant and entered Ms. Williams's car that the Defendant

---

[1] It is this court's policy to refer to victims of sexual assault by their initials.

was driving, and the Defendant drove to an abandoned lot. V.N. said that the Defendant told her to get out of the car and that she refused. She said that the Defendant threatened to "drag her a-- out of the car" and that he walked around the car, opened the door, and grabbed her by her clothes. She said the Defendant walked her to a building foundation in the lot and asked repeatedly why she called Ms. Williams. V.N. said that she denied calling Ms. Williams and that the Defendant struck her. She said that she attempted to run away but that the Defendant overpowered her, grabbed her, and said, "Are you trying to call the police? Get the police called on me?"

V.N. testified that the Defendant threw her on the foundation, that she fell to the ground, and that the Defendant kicked her in the head and buttocks and hit her with the belt. She recalled the Defendant's wearing work boots. She said that during the assault, she was crouched, that she "peeked through," and that the Defendant took a cigarette from his mouth and burned her arm twice. She had marks on her arm from the burns at the time of her testimony, which was two and one-half years after the incident. She thought the Defendant stopped attacking her because he tired. She said the Defendant then drove her home. During the drive, she said the Defendant stated that Ms. Williams had never lied to him, that he loved V.N. "like a rock," and that he would "kill a rock over" V.N. After they arrived home, the Defendant went outside for something, and she called 9-1-1 but hung up because she heard the Defendant returning. She said that the 9-1-1 dispatcher called her cell phone.

The recording of the 9-1-1 call was played for the jury. In the recording, the caller hung up after the 9-1-1 dispatcher identified herself. The 9-1-1 dispatcher called the number and a female answered the phone. The dispatcher stated that she received a 9-1-1 from the number. The female identified herself as the victim, stated, "Yes," and provided her address. The victim told the dispatcher that she had to hurry and get off the phone. When asked what occurred, the victim stated, "Domestic. I have to hurry and get off the phone." The victim stated that the incident involved her boyfriend, whom she identified as the Defendant. When asked if the Defendant assaulted her, she stated, "Yes. Yes, come on. Hurry up. I got to hang up now."

V.N. testified that after she ended the 9-1-1 call, she removed the battery from her cell phone and hid the battery and the phone under a dresser. She said that before the police arrived, she told the Defendant that she was going to save his and her lives in Jesus's name. She said three officers responded to her home. She said one of the officers, who appeared to know the Defendant, asked the Defendant if he had assaulted her. She said that the Defendant denied any wrongdoing and that the officer asked the Defendant again if he had hit her. The Defendant admitted assaulting her. The officer told the Defendant, "You know the procedure, stand up and put your hands behind your back." She told the officers that she wanted to prosecute the Defendant, but the officers did not ask whether the Defendant had

sexually assaulted her. She said that after the Defendant admitted hitting her, the police stopped questioning him. She said the officers did not ask to photograph her injuries or ask her to detail the events of the evening.

V.N. read from the arrest warrant, which stated that she and the Defendant argued, that the Defendant struck her during the argument, that she had a small abrasion and bleeding inside her mouth, that the Defendant admitted hitting her, and that she was assisted with obtaining an order of protection. She agreed that she signed the affidavit and said nothing in the narrative was false. She obtained an order of protection not long after the incident and identified the narrative in the application. She agreed that in the narrative, she explained all of the events on August 6, 2011, not just the Defendant's hitting her. Relative to the order of protection, she could not recall if she or someone else indicated her relationship to the Defendant on the application. She said that if she had completed the application, she would have marked that she and the Defendant were dating. When asked why the application did not reflect that the Defendant sexually assaulted her, she said, "Everything was going so fast and plus sometimes I don't understand words when it comes to the law." She said, though, she felt degraded and violated when the Defendant penetrated her vagina with his finger.

V.N. testified that at her home, the Defendant gave her a choice of being struck with his belt or his fist. She was resisting when the Defendant made the statement because she did not want the Defendant to hit her. She screamed and told the Defendant, "No," and the Defendant chose the belt. She grabbed the belt, and the Defendant told her to let go of it.

V.N. testified that her daughter and the Defendant's two nieces took photographs of her injuries the day of the Defendant's arrest. She said that the Defendant's niece did not provide the photographs she took. She identified the photographs taken by her daughter, which showed her injured lip, marks on her back and legs from the belt, and marks on her buttocks from the Defendant's boots.

V.N. testified that the Defendant called her from jail on the day after his arrest. A recording of the telephone conversation was played for the jury, but it was not included in the record.

V.N. testified that although she had obtained an order of protection, she felt helpless because the Defendant called her from jail. She said additional arrest warrants were obtained during the six days after the Defendant posted bond on the domestic assault charge. She said she called the police because the Defendant came to her home and taped an Al Green compact disc to her door. She had loaned the compact disc to the Defendant. She said that the Defendant continued calling her home and that she called the police. She recalled a telephone call in which an officer who responded to her home spoke to the Defendant by

-4-

telephone. She kept records of when the Defendant called and said she received multiple calls on August 8, 10, 11, and 12. She said that in one of the telephone calls, the Defendant said, "I can't live without you, you can't live without me," which she said was "one of his songs."

V.N. testified that "Ms. Alberta" called her by way of a three-way call when the Defendant was in jail. She said she told Ms. Alberta to stop calling her with the Defendant on the line because she had obtained an order of protection against him. She said Ms. Alberta was unaware of the order and stopped calling after V.N. informed her of it. She said she was scared by the Defendant's contacting her after the order of protection was obtained.

On cross-examination, V.N. testified that although the Defendant had previously "gotten physical" with her, the Defendant had never attacked her as he did on August 6, 2011. She agreed the Defendant's relationship with Ms. Williams began first and denied tension existed between her and Ms. Williams. She denied talking to Ms. Williams on the telephone or sending Ms. Williams text messages. She understood that Ms. Williams knew they were sharing the same man, although the Defendant did not flaunt the dual relationships to either of them.

V.N. testified that around midnight before the attack, she rode the bus to meet the Defendant near Ms. Williams's home. She said she met the Defendant in the parking lot of Ms. Williams's apartment complex and denied knowing which unit belonged to Ms. Williams. She said she had previously met the Defendant at the recreation and exercise room at Ms. Williams's apartment complex while Ms. Williams was at work. She said that after she met the Defendant around midnight, her daughter drove her home.

V. N. testified that the Defendant struck her with his belt more than four or five times with "excessive force" and that she yelled for the Defendant to stop. She said the music was "blasting" after the Defendant turned on the radio. She told the Defendant that she did not want to remove her underwear, that he "helped" her remove them, and that he told her to sit on the bed and spread her legs. She explained that while he pulled down her underwear, she pulled them up and that "eventually they came off." She said she had a bloody nose after the Defendant struck her twice with the belt buckle.

V.N. testified that she provided testimony at the preliminary hearing and that her testimony showed the Defendant left the apartment for five or ten minutes before driving her to the abandoned lot. She said that she did not call 9-1-1 during that time because she was scared. She said the Defendant struck her in the chest a couple of times after he returned. She did not think the Defendant tore her shirt when he pulled her from the car at the abandoned lot and said the Defendant struck her more than ten times with his belt and foot,

and he burned her with a cigarette. She shouted for the Defendant to stop. She said that after she attempted to run from the Defendant and he pulled her to the ground, she scratched her left arm, side, and head because of the way she fell.

V.N. testified that she told one of the responding police officers that she called the police and that the Defendant had assaulted her. She said that at the time of the incident, she thought "domestic cases" included sexual assault. She did not realize domestic assault and sexual assault were separate offenses. Relative to the photographs, she said nobody took photographs of the cigarette burns or the scratches to her arm and side.

V.N. testified that she did not want or consent to the Defendant's touching her. She said the Defendant called her once from the jail counselor's office. She denied pretending to be the Defendant's niece and said the Defendant pretended that he was speaking to his niece.

On redirect examination, V.N. testified that her cell phone had been under the dresser before she called 9-1-1. She agreed the phone was in the bedroom when the Defendant left for about five to ten minutes before driving her to the abandoned lot. She said that when the Defendant left, she was naked and bleeding from her nose and that she attempted to get dressed and clean her face. She said that the Defendant returned not long after she finished. She thought of calling the police but said she was scared that the Defendant would return while she was on the phone.

V.N. testified that she had previously called Ms. Williams's cell phone and explained that the Defendant called her from Ms. Williams's phone and that it was normal for her to return the Defendant's call on that number. She said that the Defendant used Ms. Williams's phone when his cell phone service was disconnected or when his phone's battery was dead. She said that the Defendant also sent text messages from Ms. Williams's phone and that she responded to the Defendant's messages.

Erin Dutton, the records custodian for Emergency Communications Center, testified that the victim's initial telephone call to 9-1-1 was received at 4:39 a.m. and that Officer Jack Stanley, the first responder, arrived at her home at 4:53 a.m. Officer Roderic Williams arrived shortly thereafter. The officers reported leaving the scene before 5:30 a.m.

Metro Police Officer Roderic Williams testified that he responded to the victim's home and that he had previous dealings with the Defendant. He stated that when he entered the home, the victim showed him a small abrasion inside her mouth and reported that the Defendant had hit her. Officer Williams saw the Defendant sitting on the sofa and said the Defendant stated that he had lost control of his emotions and struck the victim. He said that

after the Defendant admitted hitting the victim, no further action was required of him because the Defendant satisfied all the criteria for a domestic assault.

Officer Williams testified that although he arrived before Officer Stanley, Officer Stanley was the primary officer. He said the Defendant was arrested and transported to booking by 5:12 a.m. He did not question the victim further or inquire about whether she had been sexually assaulted or about any injuries she sustained. He asked the victim if she wanted to obtain an order of protection, and he noted having difficulty understanding her. His initial thought was that the victim had an intellectual disability. Relative to assisting the victim with completing the order of protection application, he said his responsibility was to ensure that the form was completed fully and that it stated the alleged incident occurred on a particular day and in Davidson County. He did not ensure the accuracy of the information contained in the application.

On cross-examination, Officer Williams testified that the victim completed the order of protection application. He said that although the home was not in disarray, he recalled an unidentified broken item. He said that if a home were in disarray, he would note it in the narrative portion of his report. He did not recall seeing any injuries to the victim's cheek or arms but said contusions and bruises commonly appeared the day after an assault. Relative to the victim's lip, he said the injury was caused by pressure applied from the outside of the victim's mouth. Although he had difficulty understanding the victim, he thought she was coherent enough to make a credible statement.

Officer Williams testified that he had known the Defendant for a long time and that the Defendant was usually under the influence of intoxicants. He thought the Defendant was under the influence on the night of the incident. He usually did not indicate on his report a person was intoxicated unless the person was "falling down" and incoherent.

Natalie Broadway, a victim-witness coordinator for the district attorney's office, testified that on August 25, 2011, she spoke to the victim about the incident. Ms. Broadway recounted the victim's statement, which was consistent with the victim's trial testimony. She could not recall if the victim used the word domestic to describe the events but said the victim did not use the word rape.

Metro Police Detective Heather Baltz testified that she had been a detective in the sex crimes unit for nine years. She discussed the police department's policy of requiring the sex crimes unit to respond to home invasion calls when a female was home alone. She said the policy was instituted in response to learning that females were not reporting sexual assaults to patrol officers. She said that frequently victims subjected to digital penetration or oral sex against their will might understand what occurred was wrong but that victims might not

necessarily understand the conduct was rape. She noted that many sexual assault victims associated rape only with penile-vaginal penetration and that many victims believed spouses or significant others could not commit rape.

On cross-examination, Detective Baltz testified that she did not investigate the present case and that she had never spoken to the victim. She said none of the detectives assigned to the sex crimes unit investigated the present case because patrol officers did not notify the unit of a possible sexual assault.

Metro Police Officer Jeff Burnette testified that he responded to the victim's home on August 9, 2011, relative to the victim's receiving harassing telephone calls. The victim reported that the Defendant had left numerous voicemail messages. The officer listened to the messages and noticed that the calls originated from the Davidson County Sheriff's Department. He said the victim was upset, scared, and afraid the Defendant might return to her home. He advised her to report the order of protection violation and to maintain a list of the calls she received. He assisted the victim in reporting the order of protection violation.

On cross-examination, Officer Burnette testified that the telephone calls were not identified as being placed by any particular inmate at the jail. He said the victim did not tell him that she had pretended to be the Defendant's niece in order for the Defendant to talk to her when the Defendant called from the counselor's office at the jail.

Metro Police Officer Wesley Tilley testified that on August 10, 2011, he responded to the victim's home relative to someone knocking on her door. He said that the victim heard a knock on the door and that she opened the door after she heard the person leave. The victim said the person had left behind a compact disc. The victim showed the officer the Al Green compact disc. The Defendant was not at the scene when the officer arrived. Officer Tilley learned that an order of protection existed, and he assisted the victim in obtaining an arrest warrant for the Defendant's violating the order of protection.

On cross-examination, Officer Tilley testified that he did not submit the compact disc for a fingerprint analysis. He concluded that the Defendant violated the order of protection based on the victim's statement. He did not recall whether he saw cuts, scrapes, bruises, or burns on the victim's arms and face. On redirect examination, he stated that he was not investigating whether the victim had injuries.

Metro Police Internal Affairs Investigator Kevin Carroll testified that he was the inmate recorded telephone system administrator. The records from the Davidson County Jail showed that on August 6, 2011, four calls were placed from the booking area at the jail to the victim's cell phone. Investigator Carroll said that an inmate identification number was not

required to place a telephone call in the booking area. The calls were placed between 8:07 a.m. and 9:53 a.m.

The first call placed on August 6, 2011, was played for the jury. In the recording, a woman answered the phone, and a man said, "I love you." The woman said, "You love me, but you beat me?" The woman said that she did not deserve it and that she had always been faithful to him.

A second call was played for the jury. This call was placed on August 8, 2011, at 8:51 p.m. from the area at the jail in which the Defendant was located. The call was also placed under the Defendant's inmate identification number. In the recording, a man, later identified as Montez, requested an unidentified woman make a three-way telephone call. The call was answered by a woman, later identified as Gina. Montez and Gina discussed his bond and his need to be released from confinement. Gina asked why he had the victim in her house. He denied the victim had been in her house. Gina stated "Cupcake" told her that Montez brought the victim to her house. They argued about whether the victim had been in her house, and Gina accused Montez of cheating. He claimed "this was all about" his not being with the victim. Montez told Gina to get his rings and that they could go their separate ways after his release.

Montez admitted he "beat her a-- with a belt," not a belt buckle, and stated that "she needed more than that." Gina asked him about whether he made the victim spread her legs in order for him to determine if she had been with another man. Montez states that he did not care with whom the victim had sexual relations because she had not had sexual relations with him. They argued about Gina's making no effort to help post his $200 bond and about whether the victim had been in her house. Montez stated that the victim thought he was "going back to her" but that he would not. Montez admitted talking to the victim earlier that day because he wanted to get out of jail and asking the victim why she was "doing this." He stated that he beat the victim because the victim "came up to the . . . apartment." Gina asked how the victim knew where she lived, but Montez did not answer. He denied that the victim had been inside Gina's house and that he had sexual relations with the victim. He told Gina that they could go their separate ways but that he wanted his mother's ring recovered from the pawn shop.

On cross-examination, Investigator Carroll testified that the four telephone calls placed on August 6 were answered and that in order to connect a call, the person receiving a call from the jail had to press zero. On redirect examination, he said of the four calls placed on August 6, only one involved a conversation.

Metro Police Detective Jack Stanley testified for the defense that he had been a patrol officer on August 6, 2011, and that he responded to the victim's home. He spoke to the victim primarily. He said the victim stated that the Defendant had suspected the victim of being unfaithful, that they argued, and that it escalated into a physical altercation. The victim told the detective that the Defendant struck her in the face. The detective saw a minor injury to the victim's lower lip and dried blood in her nose. He said the victim's injuries were consistent with her being hit in the face. He did not observe any scrapes or burns to her arms. He said the victim was upset, emotional, a little angry, and afraid. Although the detective did not have much interaction with the Defendant, he said the Defendant appeared angry.

Detective Stanley testified that the victim did not state she had been taken to another location or sexually assaulted. The detective and Officer Williams discussed the potential charges against the Defendant and agreed the Defendant would be arrested for domestic assault. He saw no evidence to warrant any additional charges.

On cross-examination, Detective Stanley clarified that the victim reported that the argument was related to the Defendant's involvement with another person, which to him meant cheating. He agreed he assumed the victim meant the Defendant was cheating on her. He agreed that it was possible the victim knew about the other person and that the victim and the Defendant argued because he thought the victim had called the other person. He said the victim reported that the Defendant struck her in the face with his open hand and his fist. He did not ask the victim if he struck her with a weapon. He said the victim reported the assault occurred outside the victim's home. He did not ask the victim if she wanted her injuries photographed, and he did not recall if he asked the victim if she had any additional injuries that were not visible. He said that after he drove the victim to obtain an order of protection, he completed his police report. He did not recall what the victim said during the drive.

On redirect examination, Detective Stanley testified that he asked the victim whether a weapon was used and noted that asking the question was standard procedure in domestic-related cases. He thought the victim stated that the Defendant hit her only once. On recross-examination, he could not explain why his report did not include the details that the victim stated she was only struck once and that she reported the assault occurred outside her home.

Bernice Williams testified that the Defendant was her boyfriend and that she had known him twenty years. Initially, their relationship lasted twelve years, but they rekindled the relationship and had been dating five or six years at the time of the trial. She said that on August 6, 2011, she received about ten hang-up telephone calls from the victim, whom Ms. Williams referred to as the Defendant's "other friend." Ms. Williams had never spoken to the victim or seen the victim before the trial. She received a sexually offensive text message from the victim. She said the Defendant used her cell phone and agreed the Defendant knew

the victim's cell phone number. Ms. Williams did not call the victim or respond to the message.

On cross-examination, Ms. Williams testified that trial counsel first asked her about the hang-up calls and the text message in 2012. She did not recall the date she received the offensive text message. She agreed that she knew of the victim's relationship with the Defendant and that the victim knew of her relationship with the Defendant. She said the Defendant's relationship with the victim always upset her. Ms. Williams confronted the Defendant about the calls, and the Defendant said he was only attempting to help the victim. Ms. Williams admitted she and the Defendant did not get married after his release from confinement but agreed the Defendant promised to marry her. She said that at the time of the incident, she worked daily from 6:00 a.m. to 2:30 p.m. and that it took her about eight or nine minutes to drive to work from her home.

On redirect examination, Ms. Williams testified that she received the offensive text message a couple of weeks before the Defendant's arrest and that she did not receive any additional messages or telephone calls until the night of the Defendant's arrest. She agreed she was wearing a ring and noted that it was the Defendant's mother's ring. She said that the Defendant had already asked her to marry him, but she had declined.

On recross-examination, Ms. Williams testified that she and the Defendant discussed the ring in a telephone call while the Defendant was in jail. She denied finding text messages on her cell phone from the victim meant for the Defendant.

Upon this evidence, the Defendant was convicted of aggravated rape, aggravated kidnapping, and aggravated stalking. The trial court sentenced the Defendant to an effective thirty-five-year sentence. This appeal followed.

The Defendant contends that the evidence is insufficient to support his aggravated rape conviction. He does not challenge his remaining convictions. He argues that "the evidence shows . . . no penetration occurred." He argues that the victim's testimony was contradicted by her statements to the police and a police officer's testimony and that her testimony is insufficient to establish penetration. The State argues the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all

reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)*; see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Aggravated rape is defined, in relevant part, as the "unlawful sexual penetration of a victim by the defendant . . . [and] [t]he defendant causes bodily injury to the victim[.]" T.C.A. § 39-13-502(a)(2). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital . . . openings of the victim's . . . body, but emission of semen is not required[.]" *Id.* § 39-13-501(7) (2010) (amended 2013). Bodily injury is defined to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" *Id.* § 39-11-106(a)(2) (2010) (amended 2011, 2014).

In the light most favorable to the State, the record reflects that the victim awoke to the Defendant's entering her home around 3:00 a.m. and asking her why she had called Ms. Williams. When the victim denied calling Ms. Williams, an argument ensued. The Defendant removed his belt and said, "I'll tell you what . . . take your clothes off . . . strip your clothes." She complied, and the Defendant said, "Stretch your hand out on the bed." As the victim turned around, the Defendant struck her back with the belt. The victim jumped, and the Defendant ordered her to "turn around" and to place her hands on the bed again. She complied, and the Defendant struck her with the belt repeatedly. The victim yelled because of the pain, and the Defendant turned on the radio to camouflage her screams. The Defendant next told the victim, "I'll tell you what . . . take your panties off. Have you had enough? Turn your legs out." The victim told the Defendant that she did not want to remove her underwear. The Defendant pulled down her underwear, and she pulled them up. The victim said her panties "eventually . . . came off." The victim sat on the bed and opened her legs as the Defendant demanded. The Defendant wrapped the belt around his hand and struck her in the face, inserted his finger in her vagina to determine if she had engaged in sexual relations with any other men, and struck her again. Although the victim sat on the bed and opened her legs, she did not consent to the Defendant's digital penetration of her vagina.

The record also reflects that the victim suffered bodily injury. The victim sustained a bloody nose and a small abrasion inside her mouth as a result of the Defendant's hitting her in the face. The photographs taken hours after the assault showed that the victim had an injured lip and markings on her back and legs from the belt the Defendant used. Although the responding officers saw minimal injuries, Officer Williams testified that contusions and bruises commonly appeared the day following an assault and that the injury to the victim's mouth was caused by pressure applied from outside the victim's mouth. We note that the Defendant admitted to the responding police officers and to Ms. Williams during a recorded telephone conversation that he hit the victim with the belt.

Although the Defendant argues that the victim's testimony was not credible because she did not allege she had been raped at the time of the incident and because her testimony was contradicted by defense witnesses, questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence" were resolved by the jury. *See Bland*, 958 S.W.2d at 659; *Sheffield*, 676 S.W.2d at 547. We note that the victim provided a statement to the victim-witness coordinator nineteen days after the incident, which was consistent with the victim's trial testimony. In any event, the jury's verdict reflects that it credited the victim's testimony that the Defendant penetrated her vagina with his finger without her consent and reflects that it found the victim suffered bodily injury. The evidence is sufficient to support the conviction, and the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's aggravated rape conviction.

_____
ROBERT H. MONTGOMERY, JR., JUDGE